## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | |
| | ) | |
| DAVID ERNEST WISH, | ) | Bankruptcy No.  09 B 13623 |
| Debtor, | ) | |
| | ) | |
| MICHAEL JOYCE, | ) | |
| | ) | |
| Plaintiff | ) | Adversary No.  10 A 00345 |
| v. | ) | |
| | ) | |
| DAVID ERNEST WISH, | ) | |
| Defendant | ) | |

## <u>AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

This matter was tried on Plaintiff's above entitled Adversary Complaint to determine

non-dischargeability of debt against the Debtor, David Ernest Wish ("Wish") under 11 U.S.C.

Sections 523(a)(2)(A), (a)(4), and (a)(6), (the "Complaint").

The Complaint seeks a finding that debts asserted in the Adversary Complaint to be due

to Plaintiff are non-dischargeable under (i) 11 U.S.C. § 523(a)(2)(A) for false pretenses, false

representation and actual fraud, (ii) 11 U.S.C. § 523(a)(4) for fraud or defalcation while acting in

a fiduciary capacity, embezzlement or larceny, and (iii) 11 U.S.C. § 523(a)(6) for willful and

malicious injury to Plaintiff's property.  At trial, Plaintiff called two witnesses, Michael Joyce,

the Plaintiff herein, and Hany Morsy, formerly a loan officer of Amcore Bank, N.A.  Defendant's

counsel called no witnesses.  In fact, Defendant David Wish did not even attend the trial, so he

did not testify.

Following trial, the following Amended Findings of Fact and Conclusions of Law are

made and will be entered.

## JURISDICTION AND VENUE

Jurisdiction lies under 28 U.S.C. § 1334 and District Court Internal Operating Procedure 15(a). The question of dischargeability of a debt is a core proceeding under 28 U.S.C. § 157(b)(2). Venue of this case is appropriate in this District pursuant to 28 U.S.C. § 1409.

## INTRODUCTION

On May 4, 2007, Amcore Bank, N.A. ("Amcore") extended to First Fruits Holdings, LLC ("First Fruits") a revolving credit facility in the principal sum of $1,000,000 (the "Loan") as reflected by a certain Commercial Loan Agreement dated May 4, 2007, with an original maturity date of May 4, 2008. (Plaintiff's Exhibit No. 17).

The Loan was established to provide financing for First Fruit's acquisition of various foreclosed residential properties in and around the Chicago Metropolitan area.

First Fruits would from time to time borrow from the Loan to purchase various residential properties in and around the Chicago Metropolitan area. The properties would be mortgaged to Amcore as security. First Fruits would then rehab and attempt to re-sell these properties to various unrelated third parties at a profit. The proceeds of sale would then be used to pay Amcore (which would, in turn, release its mortgage interest in the real property that had been sold) and pay various sale related expenses and closing costs, with the net sale proceeds to be paid to First Fruits.

Defendant David Wish ("Wish") and his associate Lance Kupisch ("Kupisch") each personally guaranteed all of First Fruits' obligations and indebtedness to Amcore by executing separate commercial guaranty agreements dated May 4, 2007. In addition, Wish pledged a personal money market account to Amcore as security for any and all loans that First Fruits had

borrowed from Amcore. In connection with that pledge, he executed an Assignment of Deposit

Account Agreement to that effect. (Plaintiff's Exhibit Nos. 18, 19 and 20).

Wish and Plaintiff Michael Joyce ("Joyce") met sometime in late 2006 and became

friends traveling together on each other's boats in and around Florida and the Caribbean in 2007.

(Wish knew Kupisch previously, and it was Kupisch who initially introduced Wish to Joyce.)

During the late summer or early fall of 2007, Wish spoke with Joyce and offered him an

opportunity to invest, through First Fruits, in certain residential real estate in and around the

Chicago Metropolitan area. There is no evidence that First Fruits was in any financial difficulty

at that time, or that First Fruits was then in default on any of its obligations to Amcore, although

as discussed below, Joyce knew when he decided to invest in First Fruits that it had already

"maxed out" its existing credit line.

Wish stated to Joyce that if Joyce opened a money market account at Amcore, the bank

would extend to First Fruits a line of credit in at least the amount that Joyce deposited there.

Wish also told him that the account set up by him at Amcore would be solely in his name and

that no one, other than Joyce himself, would have access to the money in that account. In

addition, Wish told him that the financing provided to First Fruits by Amcore would be used by

First Fruits to purchase residential real estate in and around the Chicago Metropolitan area on a

going forward basis. After opening an account at Amcore Joyce was to share in profits after First

Fruits rehabbed and re-sold the properties for a profit.

Wish's and Joyce's discussions with each other continued over a period of several

months throughout the summer and fall of 2007. During that time, Joyce did not ever come to

Chicago to inspect the activities of First Fruits. Joyce did not request nor did he receive any

financial statements, tax returns, organizational documents, nor any other records of First Fruits

- 3 -

prior to deciding to invest in it. At no time did Joyce see any of the properties that First Fruits

had purchased before he became involved, nor any of the properties that were later purchased

with his line of credit. Joyce was never a member of the First Fruits LLC, but merely an outside

investor. His intention was to earn a profit, but he knew that there was some risk involved. At

no time did Joyce consult an attorney regarding his investment in First Fruits, nor did he even

seek the advice of his friend Kupisch, who was an attorney.

Wish was not involved first hand in running the day to day operations of First Fruits.

Another person named Andy Roman ("Roman") was primarily responsible for selecting the

properties to be purchased by First Fruits, whether with the pre-existing line of credit or with

Joyce's line of credit. Joyce never met or spoke with Roman. Nor did Joyce ask to become

involved in the property selection process being handled by Roman on behalf of First Fruits.

Any profit on the sale of properties purchased with the available line of credit was by oral

agreement to be split between four individuals. Two-thirds of the profit would be split equally

between Wish, Kupisch and Joyce and the remaining one-third to Roman. At no time was there

ever any written agreement between Joyce and Wish, or between Joyce and First Fruits,

documenting the details of Joyce's relationship to First Fruits.

Wish initially recommended that Joyce invest $500,000 in First Fruits, but Joyce decided

that he could only invest $400,000. In late November or early December 2007, Wish again

contacted Joyce and urged Joyce to invest, stating that Joyce was "missing opportunities," and

that First Fruits had "maxed out" its existing line of credit. Joyce testified that First Fruits

originally had $5 million in available credit. Therefore, when told that First Fruits had "maxed

out" its existing line of credit, it was likely that Joyce knew that First Fruits was substantially

indebted to Amcore. Nonetheless, Joyce agreed to open a money market account at Amcore even

before he received any documentation of his investment or any documents from Amcore.  Before

receiving those documents, Joyce wire transferred his $400,000 account to Amcore.

In late December 2007 or early January 2008, Amcore sent Joyce an Assignment of

Deposit Account agreement (the "Assignment") (Plaintiff's Exhibit No. 4) and a Commercial

Guaranty Agreement dated February 13, 2008 (the "Guaranty") (Plaintiff's Exhibit No. 5) for

him to sign and return (collectively, the "Amcore documents"). Joyce held the documents until

February 2008, but did not sign them. Even though he had them for over a month, he testified

that he never read the contents of the documents, and that he relied on what Wish had said about

the documents he was to sign.  In February, the bank had to re-send the same documents to

Joyce, because the first set had become stale. This time Joyce signed them on or around February

13, 2008, and returned them to Amcore.  Again he did not read them before or when he signed

them, nor did he consult an attorney concerning them or show them to Wish before he signed

them.

Among the documents then signed by Joyce, the Guaranty clearly provided that Joyce

was a guarantor of any and all indebtedness incurred by First Fruits and that Joyce's account was

pledged as security, not only for Joyce's $400,000 line of credit, but for any and all prior

indebtedness incurred by First Fruits, including the Loan.

Joyce testified that he had not previously made real estate investments.  However, he

owns and operates a successful prosthetics business in New York, owns the building where that

business is situated, and owns a home in New York.

On February 13, 2008, First Fruits executed a promissory note in the principal amount

of $400,000 (the "February 2008 Note" or the "stand alone line of credit"). (Plaintiff's Exhibit

No. 3) The February 2008 Note was executed by Wish and Kupisch, who were the managers of First Fruits, and the stand alone line of credit was secured by the Assignment and the Guaranty signed by Joyce that same day.

Prior to Joyce's pledging of his money market account at Amcore (which was to be used as security for the $400,000 "stand alone" line of credit) and his signing of the Amcore documents, Wish had told Joyce that all loan proceeds related to the February 2008 Note were going to be used solely by First Fruits to purchase residential properties in and around the Chicago Metropolitan area.

Several properties were bought with funds borrowed from the stand alone line of credit backed by Joyce's money market account. Joyce received several checks representing his portion of the profits on resale of some properties. (Plaintiff's Exhibits 34-42). However, profits due to him from other resales (detailed below) were never paid to him. However, the shares of net proceeds due to Plaintiff from the resales were never set aside for him or earmarked as his property.

On or about April 9, 2008, Wish caused $100,000 to be drawn on from the February 2008 Note. Evidence showed that a deposit of $100,000 was made on the same date to a checking account belonging to First Fruits, and that this same amount was transferred the same day out of the First Fruits account to an account identified as Account Number 9802582739-D. Plaintiff introduced Exhibit 29, which contained a two-page bank statement dated January 21, 2009, from a checking account belonging in part to David Wish. It was thereby proven that Wish obtained that money from the Joyce account and deposited the same $100,000 into his personal checking account. While the $100,000 was later repaid, as discussed below, the repayment came indirectly from Plaintiff's own asset, not from Defendant.

Joyce began the month of January 2009 with the amount of $413,071.15 still on hand in his money market account. However, between January 23–27, 2009, Amcore Bank removed a total of $413,068.15 from Joyce's money market account, and applied it to outstanding indebtedness of First Fruits (as detailed below). Joyce was not asked to nor did he consent to these actions, except through the documents that he had earlier signed without reading, but there is no evidence that Wish had any hand in the bank's action.

Joyce contends that the Bank's actions were improper. However, from evidence presented here, it appears that the bank exercised its rights under the aforementioned Assignment of Deposit Account and Guaranty, both signed – but not read – by Joyce, and it thereby applied his money market funds to prior indebtedness of First Fruits.

After application of the monies from Joyce's money market account that were used to pay off First Fruits prior indebtedness under the Loan and related promissory notes only $231.58 remained in Joyce's money market account as of March 2009. (Plaintiff's Exhibit No. 15).

## DETAILED ADDITIONAL FINDINGS OF FACT

1.      Plaintiff, Michael Joyce ("Joyce"), is a citizen of the state of New York, residing in Roslyn Harbor, New York.

2.      At the time of the filing of this Complaint, Defendant David E. Wish ("Wish") was a citizen of the state of Illinois, residing in Chicago, Illinois. Wish is the Debtor in the above-referenced bankruptcy case.

3.      First Fruits Holdings, LLC ("First Fruits") was an Illinois limited liability company with its principal place of business in Chicago, Illinois.

4.      Wish, along with his business partner, Lance Kupisch ("Kupisch"), were both members and/or managers of First Fruits. Joyce was not a manager or member of First Fruits at any time.

5.      On May 4, 2007, Amcore Bank, N.A. ("Amcore") extended to First Fruits a revolving credit facility in the principal sum of $1,000,000 (the "Loan") as reflected by a certain Commercial Loan Agreement dated May 4, 2007, with an original maturity date of May 4, 2008. (Plaintiff's Exhibit No. 17) The Loan indebtedness was evidenced by a certain Promissory Note dated May 4, 2007 (the "Note"). (Plaintiff's Exhibit No. 16)

6.      The Loan was established for the sole purpose of funding First Fruit's acquisition of various foreclosed residential properties in and around the Chicago Metropolitan area.

7.      First Fruits was to use proceeds provided by Amcore under the Loan to purchase residential properties in and around the Chicago Metropolitan area, pledge those properties as collateral security to Amcore in the form of a mortgage, rehab the properties and then "flip" (sell) the residential properties to various third parties. The proceeds of sale would then be used to pay off Amcore (who would, in turn, release its mortgage interest in the real property) and to pay various sale related expenses and closing costs, with the balance of the proceeds, if any, to be paid to First Fruits.

8.      Contemporaneously with the execution of the Loan and Note, Wish and Kupisch each personally guaranteed all of First Fruits' obligations and indebtedness to Amcore by executing separate commercial guaranty agreements dated May 4, 2007. In addition, Wish pledged his money market account of $500,000 to Amcore for any and all loans that First Fruits had with Amcore and, in connection with that unlimited pledge, executed an Assignment of Deposit Account Agreement to that effect. (Plaintiff's Exhibit Nos. 18, 19 and 20)

- 8 -

9.      As a result, Plaintiff argues that Wish knew about the structure of his transaction

with Amcore and the contents of the loan and collateral related documents that Amcore used in

transactions of this type, so he must have deduced that the bank would always use the same

forms for similar transactions.

10.     The Loan specifically listed Wish and Kupisch as unlimited guarantors.

11.     As First Fruits would draw on the Loan to purchase residential property in and

around the Chicago Metropolitan area, the amount of the draw was to be documented with a

separate promissory note and Amcore would be secured by a mortgage on the specific parcel of

purchased real property.

12.     On or about January 7, 2007, First Fruits used the Loan to purchase real property

located at 7920 S. Langley, Chicago, Illinois (the "Langley Property").

13.     Amcore funded and advanced monies in the principal amount of $120,080 to First

Fruits under the Loan so that First Fruits could purchase the Langley Property. According to the

underlying loan documents, the indebtedness related to this acquisition matured on January 7,

2008.

14.     On or about November 9, 2007, First Fruits used the Loan to purchase real

property located at 3318 W. Ohio St., Chicago, Illinois (the "Ohio Street Property").

15.     Amcore funded and advanced monies in the principal amount of $98,828.28 to

First Fruits under the Loan so that First Fruits could purchase the Ohio Street Property.

According to the underlying loan documents, the indebtedness related to this acquisition matured

on November 9, 2008. (Plaintiff's Exhibit No. 11)

16.     On or about November 12, 2007, First Fruits used the Loan to purchase real

property located at 5235 W. 30th St., Cicero, Illinois (the "Cicero Property").

17.    Amcore funded and advanced monies in the principal amount of $126,400 to First Fruits under the Loan so that First Fruits could purchase the Cicero Property. According to the underlying loan documents, the indebtedness related to this acquisition matured on November 12, 2008. (Plaintiff's Exhibit No. 13)

18.    On or about August 6, 2007, First Fruits used the Loan to purchase real property located at 624 N. Lorel Avenue, Chicago, Illinois (the "Lorel Avenue Property").

19.    Amcore funded and advanced monies in the principal amount of $72,574.40 to First Fruits under the Loan so that First Fruits could purchase the Lorel Property. According to the underlying loan documents, the indebtedness related to this acquisition matured on August 6, 2008. (Plaintiff's Exhibit No. 9)

20.    As detailed below, the loans for the Ohio Street, Cicero and Lorel Avenue properties were eventually paid off through Amcore with the monies deposited by Joyce in his money market account at Amcore.

21.    In December 2007, First Fruits was indebted to Amcore under the Loan in the amount of approximately $1,000,000. (Plaintiff's Exhibit No. 22)

22.    Wish and Joyce had met sometime in late 2006 and became friends traveling together on each other's boats in and around Florida and the Caribbean in 2007.

23.    During the late summer or early fall of 2007, Wish contacted Joyce and offered him an opportunity to invest, through First Fruits, in certain residential real estate in and around the Chicago Metropolitan area.

24.    During their conversations regarding the investment opportunity, Wish told Joyce that if Joyce opened a money market account at Amcore, the bank would agree to extend to

Wish, or an entity that he controlled (which Joyce later learned was First Fruits), a line of credit
equal to at least the amount that Joyce deposited at that bank.

25.    Wish also told Joyce that any account set up by him at Amcore would be solely in
his name and that no one, other than Joyce, would have access to the money in that account.
Wish said to Joyce that such account was to earn interest for Joyce's sole benefit.

26.    Wish further told Joyce that any money deposited with Amcore would be a safe
and secure investment because the value of the properties purchased after they were rehabbed by
First Fruits would always exceed the amount advanced and that Wish and Kupisch had sufficient
funds to make good on any possible although unlikely shortfall in the event any of the properties
were sold for less than the indebtedness related to a particular property.

27.    On several occasions, Wish told Joyce that if Joyce established a deposit account
at Amcore the financing provided to First Fruits by Amcore would be used by First Fruits solely
to purchase residential real estate in and around the Chicago Metropolitan area. The goal, as
represented to Joyce by Wish, was that the residential properties purchased under this particular
line of credit would be rehabbed and resold to various third parties for a profit.

28.    Wish told Joyce that when a piece of residential property was purchased under the
line of credit that was to be secured by Joyce's money market account, the property would remain
as security for the line of credit until the property was re-sold. The net proceeds, after the
mortgage and other expenses were paid, would then be distributed to Wish, Kupisch, Joyce and
an individual named Andy Roman ("Roman") and Joyce's profits would be deposited into his
money market account or sent to him via check by First Fruits.

29.     Wish also said to Joyce that profit from the resales would be split between four individuals, two-thirds of the profit would be split equally between Wish, Kupisch and Joyce and the remaining one-third to Roman.

30.     Wish further told Joyce that Wish and his business partner, Kupisch, had established their own deposit accounts at Amcore to serve as security and, as a result, had also received lines of credit from Amcore. (Plaintiff's Exhibit No. 18)

31.     Wish informed Joyce that the money market account to be pledged by Joyce to Amcore for the stand alone line of credit was to serve only as security for that line of credit and not for any other loans that First Fruits may have had with Amcore.

32.     Plaintiff argues that Wish made these oral statements to Joyce even though Wish's own money market account was pledged for any and all First Fruits indebtedness by virtue of the Assignment of Deposit Account Agreement that he had previously executed.  This argument assumes that because Wish knew that his own pledge was of an unlimited nature, he therefore knew Plaintiff's pledge would also be unlimited even though the evidence did not show that Wish read the papers sent to Joyce by Amcore.

33.     In approximately late November or early December 2007, Wish again contacted Joyce to let Joyce know that they had located several residential properties that they wanted to purchase through First Fruits, and that Wish had already lined up third party buyers to acquire those properties once they were rehabbed.  However, in order to acquire these properties, Wish told Joyce that he needed Joyce to open a money market account at Amcore immediately, (even though this conversation was held before the relevant loan/security related documents had been forwarded to Joyce by Amcore) so that Amcore could provide First Fruits with the additional financing to purchase these residential properties.

34.    Wish also told Joyce that the documents that Joyce was to receive and sign would protect Joyce and his money market account and would be consistent with what Wish had previously represented to Joyce. However, Wish did not ever tell Joyce that Wish would have a hand in drafting those documents or that he would ever review them or that he had read them.

35.    In December 2007, at Wish's request, and before receiving the transaction related documents, Joyce opened a money market account at Amcore by wire transferring the sum of $400,000 to Amcore. At the time that the wire was sent, Joyce had not received any loan, pledge or other bank related documents from Wish or Amcore, except an account opening form or card.

36.    At no time did Wish ever advise Joyce that Joyce was going to be guaranteeing any prior indebtedness of First Fruits, including the Loan, or that his money market account was being pledged to secure prior indebtedness of First Fruits. In fact, Wish told Joyce that the documents that he was to sign related only to the $400,000 stand alone line of credit that was tied to his money market account.

37.    At no time did Wish ever advise Joyce that First Fruits, Wish and Kupisch, as guarantors of the Loan, owed Amcore approximately $1,000,000, or that Wish's pledge of his money market account was of an unlimited nature.

38.    In late December 2007 or early January 2008 and then again in February 2008, Amcore sent Joyce a form for assignment of his deposit account (the "Assignment") (Plaintiff's Exhibit No. 4) and a commercial guaranty agreement dated February 13, 2008 (the "Guaranty") (Plaintiff's Exhibit No. 5) to execute (collectively, the "Amcore documents").

39.    Although Wish represented to Joyce that the Amcore documents to be received by Joyce would be consistent with terms that Wish had previously discussed with Joyce, he never

represented that he would review or had reviewed those documents or that he had a hand in preparing them.

40.    Joyce testified that he was reassured by Amcore loan officer, Michael Cibelli ("Cibelli"), both before and after receiving the Amcore documents that his money market account was to serve only as collateral for the $400,000 stand alone line of credit to be given to First Fruits by Amcore.

41.    Joyce executed the Assignment and Guaranty on or about February 13, 2008. Joyce did not read those documents before signing them, or have legal counsel review the Amcore documents for him.

42.    The Guaranty that Joyce signed clearly provided that he was a guarantor of any and all indebtedness incurred by First Fruits and that Joyce's account was pledged as security, not only for the $400,000 stand alone line of credit, but for any and all prior indebtedness incurred by First Fruits, including the Loan.

43.    Although Joyce owns and operates a prosthetics business in New York at the time he was asked to sign the Amcore documents, he had never invested in a real estate venture nor had he signed loan related documents in connection with any real estate investment opportunity. As a result, he was unfamiliar with the form of Amcore documents before he signed them. However, he was an educated man who knew that commercial documents signed by him would have meaning and importance.

44.    On February 13, 2008, First Fruits executed a promissory note in the principal amount of $400,000 (the "February 2008 Note" or the "stand alone line of credit"). (Plaintiff's Exhibit No. 3) The February 2008 Note was executed by Wish and Kupisch, who were the

managers of First Fruits, and the "stand alone" line of credit was secured by the Assignment and the Guaranty.

45.    Immediately after Amcore received Joyce's wire transfer of $400,000 in December 2007, a significant portion of the wired funds were withdrawn by either Amcore or Wish or Kupisch on behalf of First Fruits, and used to purchase real estate. (Plaintiff's Exhibit No. 1). This money deposited by Joyce was not then authorized in writing to be used for that purpose, but eventually it was redeposited back into Joyce's money market account in late February 2008 and that temporary withdrawal did not cause any harm or loss to Joyce.

46.    On or about April 9, 2008, Wish caused $100,000 to be drawn from the February 2008 Note as a loan to himself personally. That loan was not authorized by Joyce. Said funds were then deposited into Wish's personal checking account at Amcore (Checking Account No. 9802582739). (Plaintiff's Exhibit Nos. 8, 23, 26 and 29)

47.    The $100,000 loan taken by Wish was not used by Wish to purchase, rehab, and re-sell any properties that were to be acquired with the proceeds from the February 2008 Note secured by Joyce's money market account at Amcore, nor was this personal loan advance ever paid back by Wish from his own assets. Instead, Joyce's own money market account pledge was used by Amcore in January 2009 to pay back this personal loan advance made by Wish.

48.    Amcore eventually used Joyce's money market account to also satisfy and reduce the pre-existing indebtedness owed to Amcore, including the amounts due under the Loan and related promissory notes and the personal loan advance taken by Wish under the February 2008 Note.

49.    Specifically, on January 23, 2009, the sum of $73,480.57 was applied from Joyce's money market account to pay off a preexisting First Fruits Promissory Note dated August

1, 2007 related to the Lorel Avenue Property. (Plaintiff's Exhibit Nos. 7, 9 and 10) On January

23, 2009, the sum of $100,019.02 was applied from Joyce's money market account to pay off a

preexisting First Fruits Promissory Note dated November 9, 2008 related to the Ohio Street

Property. (Plaintiff's Exhibit Nos. 7, 11 and 12) On January 23, 2009, the sum of $127,867.64

was applied from Joyce's money market account to pay off a preexisting First Fruits Promissory

Note dated November 12, 2007 related to the Cicero Property. (Plaintiff's Exhibit Nos. 7, 13 and

14) On January 23, 2009, the sum of $95,125.64 was applied from Joyce's money market

account to cover Wish's personal loan advance of $100,000. Finally, on January 27, 2009, the

sum of $16,578.28 was applied from Joyce's money market account for other indebtedness of

First Fruits. The foregoing payments served to pay in full the past obligations of First Fruits to

Amcore.

50.     After application of the monies from Joyce's money market account that were

used to pay off First Fruits prior indebtedness under the Loan and related promissory notes and

also the unauthorized personal loan advance taken by Wish under the February 2008 Note, only

$231.58 remained in Joyce's money market account as of March 2009. (Plaintiff's Exhibit No.

15).

51.     None of the real estate acquired with the proceeds of the February 2008 Note

resulted in any losses for First Fruits; all real estate acquired by First Fruits with proceeds from

the February 2008 Note turned a profit.

52.     In March 2008, First Fruits purchased the property commonly known as 380 W.

Rosalie Lane, Palatine, Illinois (the "Palatine Property") with the proceeds from the February

2008 Note (Plaintiff's Exhibit No. 30) and then sold, through a Land Trust in which First Fruits

was the sole beneficiary (Plaintiff's Exhibit No. 21), said property to a third party in July 2008,

receiving net sales proceeds of $96,924.76. These funds were then deposited into First Fruits'

business account held at Amcore. (Plaintiff's Exhibit No. 28) The funds deposited into First

Fruits' business account represented net profits from this sales transaction since all expenses

related to the acquisition and sale, including closing costs are normally required to be paid at the

closing by the title company in accordance with the Settlement Statement. (Plaintiff's Exhibit

No. 33).

53.     Although amounts advanced under the February 2008 Note for purchase of the

Palatine Property were repaid at the closing (Plaintiff's Exhibit No. 31), Joyce did not receive

from First Fruits any share of the net sales proceeds that constituted profits, and which under

their agreement would have been one third of two thirds of $96,924.76, or the sum of $21,538.

54.     First Fruits also purchased the property commonly known as 4462 W. Devon

Avenue, Lincolnwood, Illinois (the "Devon Property") with proceeds from the February 2008

Note (Plaintiff's Exhibit No. 43), and then resold that property in July 2008, receiving net sales

proceeds of $18,686.89. (Plaintiff's Exhibit No. 42) The proceeds were then deposited into First

Fruits' business account held at Amcore. (Plaintiff's Exhibit No. 28) The funds deposited into

First Fruits' business account represented net profits from this sales transaction since all

expenses related to the acquisition and sale, including closing costs, are normally required to be

paid at closing by the title company in accordance with the Settlement Statement. (Plaintiff's

Exhibit No. 42) Although amounts advanced under the February 2008 Note for purchase of the

Devon Property were repaid at the closing, Joyce did not receive from First Fruits the portion of

profits from net sales proceeds, which under the agreement with Wish would have been one third

of two thirds of this $18,686.89, or the sum of $4,152.64.

55.    Despite numerous requests from Joyce, Wish failed to provide Joyce with any written documentation, financial information or an accounting of profits regarding the real estate transactions.  Joyce's shares of the profits relating to the Palatine and Devon property resales were not paid to Joyce by First Fruits, but rather were used for other uses. However, the evidence did not show that any share of profits due Joyce from any resale of property was ever earmarked as his property or set aside for him,

56.    Facts set forth in the Conclusions of Law will stand as additional Findings of Fact.

## CONCLUSIONS OF LAW

### Count I
### Objection to Dischargeability of Debt Under 11 U.S.C. Section 523(a)(2)(A)

Section 523(a)(2)(A) of the Bankruptcy Code forbids the discharge of any debt incurred by false pretenses, a false misrepresentation, or actual fraud, perpetrated in order to secure credit, money or property from another, other than a statement respecting the Debtor's or an insider's financial condition. 11 U.S.C. § 523(a)(2)(A). If a non-dischargeable debt includes under law an award of attorneys' fees, the amounts due for such fees would also be non-dischargeable. Cohen v. de La Cruz, 523 U.S. 213, 223 (1998) (involving a violation of New Jersey statute that allowed an award of attorneys fees).

False pretenses in the context of § 523(a)(2)(A) include implied misrepresentations or conduct intended to create or foster a false impression. Mem'l Hosp. v. Sarama (In re Sarama), 192 B.R. 922, 927 (Bankr. N.D. Ill. 1996). False pretenses do not necessarily require overt misrepresentations. If a debtor has a duty to disclose, omissions or a failure to disclose on the part of the debtor can constitute misrepresentations where the circumstances are such that omissions or failure to disclose creates a false impression that is known by the debtor. Sarama,

192 B.R. 922, 928; Shelby Shore Drugs, Inc. v. Sielschott (In re Sielschott), 332 B.R. 570, 573

(Bankr. C.D. Ill. 2005) (finding that silence or concealment may constitute false pretenses).

A creditor must establish the following elements: (1) the debtor made a false

representation of fact; (2) which the debtor (a) either knew to be false or made with reckless

disregard for its truth and (b) made with an intent to deceive; and (3) the creditor justifiably

relied on the false misrepresentation.  In re Bero, 110 F.3d 462, 465 (7th Cir. 1998); Banker Dev.

Corp. v. Mulder (In re Mulder), 307 B.R. 637, 643 (Bankr. N.D. Ill. 2004).

"False representation" does require an express misrepresentation that can be

demonstrated either by a spoken or written statement or through conduct of the debtor. New

Austin Roosevelt Currency Exchange, Inc. v. Sanchez (In re Sanchez), 277 B.R. 904, 908

(Bankr. N.D. Ill. 2002). Furthermore, the failure to disclose pertinent information may also

constitute a false representation where the circumstances imply a specific set of facts and

disclosure is necessary to correct what would otherwise be a false impression. Trizna & Lepri v.

Malcom (In re Malcom), 145 B.R. 529, 263 (Bankr. N.D. Ill. 1992).

Actual fraud is not limited to misrepresentation but may encompass any deceit, artifice,

trick, or design involving direct or active operation of the mind, used to circumvent and cheat

another. McClellan v. Cantrell, 217 F.3d 890, 893 (7th Cir. 2000). Unlike with false pretenses or

misrepresentation, the creditor need not allege misrepresentation and reliance to establish a cause

of action for fraud under Section 523(a)(2)(A); instead, the creditor must prove that (a) an actual

fraud occurred; (b) the debtor intended to defraud the creditor; and (c) the fraud created the debt

at issue. Wallner v. Liebl (In re Liebl), 434 B.R. 529 (Bankr. N.D. Ill. 2010).

Because a debtor will rarely, if ever, admit to acting with intent to defraud, the scienter

element may be inferred from the surrounding circumstances. Hickory Point Bank & Trust FSB

v. Kucera (In re Kucera), 373 B.R. 878, 884 (Bankr. C.D. Ill. 2007). Proof of intent to deceive is

to be measured by the debtor's subjective intent at the time the representation was made. CFC

Wire Forms, Inc. v. Monroe (In re Monroe), 304 B.R. 349, 356 (Bankr. N.D. Ill. 2004).  Relevant

circumstances that took place after the debt was incurred may be considered, (Sears, Roebuck &

Co. v. Green (In re Green), 296 B.R. 173, 179 (Bankr. C.D. Ill. 2003)), if that conduct provides

an indication of his state of mind at the time of the misrepresentation. Rose v. Gelhaar (In re

Gelhaar), Case No. 09 B 07578, Adv. No. 09 A 900504, 2010 Bankr. LEXIS 3899, at * 23

(Bankr. N.D. Ill. Nov. 17, 2010) (J., Squires). Thus, intent may be inferred from the surrounding

circumstances. Kucera, 373 B.R. at 884. From all of the evidence provided, it must determined

whether the circumstances, viewed as a whole, presents a picture of debtor's deceptive conduct

indicating intent to defraud. Cripe v. Mathis (In re Mathis), 360 B.R. 662, 666 (Bankr. C.D. Ill.

2006).

     Intent to deceive may be inferred where a person knowingly or recklessly makes false

misrepresentations that the person knows or should know whether it was true or false and that it

will induce another to act. Bletnitsky v. Jairath (In re Jairath), 259 B.R. 308, 315 (Bankr. N.D. Ill.

2001). It is not necessary that Debtor obtain money or property for himself through false

pretenses or fraud under Section 523(a)(2)(A). Weinreich v. Langworthy (In re Langworthy), 121

B.R. 903, 907 (Bankr. M.D. Fla. 1990).

     However, it is critical for an action under § 523(a)(2)(A) that the aggrieved party must

establish that he "justifiably" relied on the false pretense or false representation made by the

defendant. Field v. Mans, 516 U.S. 59, 74-75 (1995). Justifiable reliance is an intermediate

standard, requiring less than reasonable reliance, but more than reliance in fact. Goldberg v.

Ojeda, 417 B.R. 59 (Bankr. N.D. Ill. 2009). The justifiable reliance standard imposes no duty to

investigate unless falsity is readily apparent. Field v. Mans, 516 U.S. 59, 70-72 (1995). However, "a person is required to use his sense and cannot recover if he blindly relies on a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation. *Id.* at 71. Whether a party can be held to have justifiably relied on a misrepresentation is determined by looking at the circumstances of the particular case and the characteristics of the particular plaintiff. *Id.* It is not an objective standard. *Id.*

Plaintiff argues that he has satisfied all requirements to deny Wish's discharge under Section 523(a)(2)(A), contending as follows:  That representations made by Wish to Joyce regarding the nature of the Amcore documents to be signed by him in order to pledge his money market account, and the purpose for which the pledge was intended were false and fraudulent, and that Wish's statements created or fostered a false impression of, among other things, the nature of the transaction and that Joyce's pledge of his money market account would be of a limited nature. In particular, he argues that prior to pledging his money market account at Amcore (which was to be used in connection with the stand alone line of credit) and his signing of the Amcore documents, Wish represented to Joyce that all of the loan proceeds related to the February 2008 Note were going to be used solely by Wish and First Fruits to purchase distressed residential properties in and around the Chicago Metropolitan area.  Plaintiff contends that in actuality, the Assignment and Guaranty that were signed by him were also used ultimately by Wish as a means to reduce other First Fruits indebtedness, i.e., the Loan (of which Wish was a guarantor), and to otherwise benefit Wish, Kupisch and First Fruits in connection with its relationship with Amcore, all of which provided little or no value to Joyce.

This Count rests on what Wish said to Joyce concerning the Amcore documents before Wish signed them.  Wish told Joyce that the money market account that he pledged to Amcore

for the stand alone line of credit was to secure only that line credit and no other loans that First

Fruits had with Amcore. This argument assumes that Wish was fully familiar with Amcore

documents that he himself had previously signed (Assignment of Deposit Account Agreement

and Personal Guaranty), which were both unlimited in nature. Plaintiff reasons that Wish should

have known that the Amcore documents that he signed were going to be the same type of

documents that Joyce was going to be asked to sign since the structure of the transactions were

identical.

Assuming accuracy of testimony as to representations made by Wish concerning

documents from Amcore to be signed by Joyce (particularly since Wish did not testify to deny

that testimony), it remains questionable that Joyce could have justifiably relied thereon. Plaintiff

is an educated man who, despite lacking law training, knew from his personal business and other

experience that words in contracts signed by him have meaning. He could not justifiably rely on

a statement by Wish that bank documents would say something though Wish did not claim to

have either prepared or even seen these documents.

Those entering into a large financial transaction needs to read the documents before

signing them or get a lawyer to read them. Joyce did neither and thus signed away rights that the

Bank later took advantage of. Plaintiff's logic and argument that he could justifiably rely on

Defendant's prediction about what the documents would say without himself reading them or

obtaining counsel to read them disregards the need for anyone to take minimal steps to know

what they sign. It might be argued as well that if anyone tells us no traffic is coming that we may

justifiably rely on that advice and step off the curb without looking. Likewise it is not justifiable

to sign commercial documents without reading them. Therefore, the loss of Plaintiff's $400,000

was not due to his reliance on statements made by Defendant to him, but was due to the Bank's

exercise of rights pursuant to documents signed by Plaintiff that he never read or obtained legal advice on.

Finally, it is argued that Wish committed fraud because he failed to cause the corporation to distribute certain profits that rightfully were due to Joyce in connection with the sale of the Palatine and Devon properties. The evidence showed that the parties had an agreement for sharing of profits in home resales, and that Defendant entered into the agreement orally on behalf of the corporation First Fruits. Arguably, evidence also showed that First Fruits used the net profits due to Plaintiff for something other than paying him all shares of profits that were due, all while Defendant controlled First Fruits. However, while that evidence showed a contract breach by First Fruits, it does not prove a fraud by Defendant. The evidence did not trace or show what was done by First Fruits with monies that might have been used to pay shares of profits due to Plaintiff or show a diversion of funds due Plaintiff into Defendant's pockets. Moreover, the monies due from the corporation to Plaintiff were never segregated or earmarked as being property of the Plaintiff. As to each, however, Plaintiff did not establish a fraud by defendant or any false pretenses or misrepresentations that lead to loss of the profit shares.

Most significantly, Plaintiff did not plead or attempt to prove that the corporate form of First Fruits should be disregarded under possible legal theories so as to impose its obligations to Wish. Illinois law applies as First Fruits Holdings, LLC was an Illinois limited liability company with its principal place of business in Chicago, Illinois. Stromberg Metal Works v. Press Mech., 77 F.3d 928, 933 ((7th Cir. 1996). ("Efforts to 'pierce the corporate veil' are governed by the law of the state of incorporation."). Under Illinois law, two requirements must be met to disregard the corporate form. Gallagher v. Reconco Builders, Inc., 415 N.E.2d 560, 564 (Ill. App. 1980) First, there must be such a unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist. Id. Second, circumstances must be such that an

adherence to the fictions of corporate existence would sanction a fraud or promote injustice. Id.

at 564. Plaintiff did not plead under this theory or produce evidence to satisfy his burden under

these requirements.

Accordingly, judgment on Count I must favor Defendant.

### Count II
### Objections to Dischargeability of Debt Under 11 U.S.C. Section 523(a)(4)

Section 523(a)(4) of the Bankruptcy Code provides that a debtor shall not be discharged

from any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or

larceny." 11 U.S.C. § 523(a)(4). To prevail under 11 U.S.C. § 523(a)(4), the moving party must

prove that the debtor committed (1) fraud or defalcation while acting in a fiduciary capacity; or

(2) embezzlement; or (3) larceny.

Under § 523(a)(4) debts arising out of the debtor's embezzlement (In re Powers, 261 Fed.

Appx. 719 (5th Cir. 2008)) or larceny are exempted from discharge, (In re Ormsby, 591 F.3d

1199 (9th Cir. 2010)), whether or not the debtor was acting in a fiduciary capacity at the time of

the misconduct. To establish a claim for embezzlement, Joyce must show that the Debtor

misappropriated Joyce's property for his own benefit with fraudulent intent. Zamora v. Jacobs (In

re Jacobs), 448 B.R. 453 (Bankr. N.D. Ill. 2011); see also Sherman v. Potapov (In re Sherman),

603 F.3d 11, 14 (1st Cir. 2010). A trust or fiduciary relationship need not be established in order

to find a debt excepted from discharge by an act of embezzlement. Green v. Pawlinski (In re

Pawlinski), 170 B.R. 380, 390 (Bankr. N.D. Ill. 1994). "The essence of the common law concept

[of embezzlement] is knowing use of entrusted property for an unauthorized purpose, there is no

exception for financial joy riding (unauthorized 'borrowing' [even] with intent to repay is still

embezzlement, the borrowing being unauthorized)." In re Sherman, 603 F.3d 11, 15 (1st Cir.

2010) (citation omitted).

For purposes of Section 523(a)(4), the definition of larceny is a matter of federal common law and is therein defined as a "felonious taking of another's personal property with intent to convert it or deprive the owner of the same." 4 Collier on Bankruptcy Section 532.10[2] (15th ed. rev. 2008); *see also* Kaye v. Rose (In re Rose), 934 F.2d 901 (7th Cir. 1991). Intent to convert or deprive may be inferred from the totality of the circumstances and the conduct of the person accused. Kaye v. Rose (In re Rose), 934 F.2d 901, 904 (7th Cir. 1991).

Section 523(a)(4) also exempts from discharge debts based on fraud or defalcation by a person acting in a fiduciary capacity. In re McGee, 353 F.3d 537 (7th Cir. 2003); In re Short, 818 F.2d 693 (9th Cir. 1987); Ragsdal v. Haller, 780 F.2d 794 (9th Cir. 1986); In re Barker, 40 B.R. 356 (Bankr. D. Minn. 1984). To prevail under this theory a plaintiff must ordinarily establish existence of an express trust or a fiduciary relationship and a debt caused by the debtor-defendant's defalcation while acting as a fiduciary.  See Grogan v. Garner, 498 U.S. 279, 291 (1991); In re Woldman, 92 F3d 546 (7th Cir. 1996); Vozella v. Basel-Johnson (In re Basel-Johnson), 366 B.R. 831, 848 (Bankr. N.D. Ill. 2007).

However, a fiduciary relationship upon which a claim under Section 523(a)(4) may also arise when there is:

> . . . . a difference in knowledge or power between fiduciary and principal which … gives the former a position of ascendancy over the latter. The fiduciary may know much more by reason of professional status, or the relation may be one that requires the principal to repose a special confidence in the fiduciary…. These are all situations in which one party to the relation is incapable of monitoring the other's performance of his undertaking, and therefore the law does not treat the relation as a relation at arm's length between equals.

Illinois v. Marchiando (In re Marchiando), 13 F.3d 1111 (7th Cir. 1994).

Joyce argues that he has established a claim for larceny and embezzlement as he has shown that Wish somehow misappropriated $100,000 of Joyce's contributed account at Amcore for his own benefit. Since Wish knew that his taking of $100,000 was not authorized, Joyce

argues that fraudulent intent can be inferred. He also argues that Wish's failure to testify creates an adverse inference that any explanation Wish could have offered would injure his case.

Likewise, it is argued that the elements of larceny have also been established as Wish through First Fruits knowingly kept Plaintiff's share of profits with intent to convert it or deprive Joyce of it. It was here proved that First Fruits failed to distribute shares of profits rightfully due to Joyce in connection with sales of the Palatine and Devon properties. However, the complaint as to profits not paid to Plaintiff by First Fruits is not valid because, as earlier discussed, the corporate form may not be disregarded here, and those profits were not earmarked or set aside as Plaintiff's property.

Under the Seventh Circuit's definition in Marchiando of what constitutes a fiduciary relationship, Plaintiff argues that a real disparity in knowledge and economic status and power between the two parties was established when Joyce became an investor. Wish, as the supposed fiduciary, is said to have had a status and knowledge superior to Joyce. This disparity arguably grew as Wish refused to provide Joyce with any financial information, accounting or other documents related to First Fruits and the properties that it acquired. Moreover, while an asserted fiduciary, Wish took out an unauthorized personal loan of $100,000 from First Fruits thereby increasing the debt of First Fruits to Amcore, guaranteed by Joyce's asset that was only to be used to purchase residential properties for investment and resale.

However, a fiduciary relation qualifies under §523(a)(4) only if it "imposes real duties in advance of the breach . . . ." Marchiando, 13 F.3d at 1116. In other words, the fiduciary's obligation must exist prior to the alleged wrongdoing. The reach of Marchiando was recently further explained by the Seventh Circuit Opinion in In re Berman:

> Not all persons treated as fiduciaries under state law are considered to "act in a fiduciary capacity" for purposes of federal bankruptcy law . . . The Supreme Court taught in Davis v. Aetna Acceptance Co., 293 U.S. 328 (1934), that the

- 26 -

non-dischargeability exception's reference to fiduciary capacity was "strict and narrow." As Justice Cardozo wrote for the Court, the debtor "must have been a trustee before the wrong and without reference thereto." Those facts are not present in a situation . . . where the corporation's breach of its contract created the debt. The resulting obligation to the creditor is not "turned into "one arising from a trust . . . Such obligations are "remote from the conventional trust or fiduciary setting, in which someone . . . in whom confidence is reposed is entrusted with another person's money for safekeeping.

Berman, 629 F. 3d 761, 767 (7th Cir. 2011). That language would negate Plaintiff's theory concerning the profit shares never paid to him.

While the fiduciary theory is certainly arguable as to the $100,000 taking, regardless of whether that theory applies here, Plaintiff clearly prevails under his larceny and embezzlement theory. Defendant deliberately found a means to snatch $100,000 of funds from Amcore out of a loan based on credit from Plaintiff's account and used that property with fraudulent intent for his own purposes unrelated to the venture for which it was pledged. The withdrawal of $100,000 was never repaid by Defendant out of his assets, and the larceny and embezzlement of those funds thereby reduced Plaintiff's account at Amcore and ultimately damaged him in that amount.

It is undisputed that the $100,000 taking benefitted Wish and was not used by Wish to purchase, rehab and flip any properties that were to be acquired with the proceeds from the February 2008 Note secured by Joyce's money market account[1], nor was this taking ever repaid by Wish.

---

[1] Paragraph 38 of the Amended Stipulation of Facts states as follows:

"On or about April 9, 2008, Wish caused $100,000 to be drawn from the $400,000 February 2008 Note as a loan to him personally. Said funds were then deposited into Wish's personal checking account at Amcore (Checking Account Number 9802582739)."

Paragraph 39 of the Amended Stipulation of Facts states as follows:

"The $100,000 loan advance was not used by Wish to purchase, rehab and flip any properties that were to be acquired with the proceeds from the $400,000 February 2008 Note secured by Joyce's money market account at Amcore."

In Defendant's Amended Proposed Findings of Fact and Conclusions of Law, Defendant

attempts to avoid this issue by claiming that Joyce was not damaged by this personal loan since it

came from the stand alone line of credit as opposed to Joyce's money market account. That

argument lacks merit.

Documents admitted into evidence demonstrated that there was no balance actually

remaining due under the First Fruits line of credit once the Joyce asset was used to pay the

lender. The loan history report for the one million dollar line of credit issued to First Fruits

Holdings LLC (Plaintiffs' Exhibit No.22) shows that it was paid in full on December 19, 2008 by

exhausting Plaintiff's asset securing that loan. Defendant's claim that Joyce suffered no damage

from the taking was thereby contradicted by the evidence. Accordingly, the unauthorized taking

of $100,000 by Wish for his own use was a larceny and embezzlement that damaged Plaintiff in

that amount.

Plaintiff's Count II will therefore prevail as to the $100,000 taking.

### *Count III*
### *Objection to Dischargeability of Debt Under 11 U.S.C. Section 523(a)(6)*

Section 523(a)(6) of the Bankruptcy Code provides that a debtor shall not be discharged

from any debt "for willful and malicious injury by the debtor to another or to the property of

another." 11 U.S.C. § 523(a)(6). A creditor must prove three elements under that provision: (a)

that the debtor intended to and caused injury to the creditor or his personal property interest; (b)

that the debtor's actions were willful; and (c) that the debtor's actions were malicious. Birriel v.

Odeh (In re Odeh), 431 B.R. 807, 817 (Bankr. N.D. Ill. 2010). To satisfy the requirements of

§ 523(a)(6), a creditor must prove that the debtor actually intended to cause harm to him or his

property and not merely that the debtor acted intentionally and the creditor or property was thus

harmed. Kawaauhau v. Geiger, 523 U.S. 57 (1998). Either a showing of prospective intent to

- 28 -

injure someone or showing a knowledge by the actor that injury to plaintiff or plaintiff's property

was substantially certain to result from acts performed intentionally will establish the intent

required under Geiger.  Mutual Management Services, Inc. v. Fairgrieves (In re Fairgrieves), 426

B.R. 748, 756 (Bankr. N.D. Ill. 2010).

Conduct is "malicious" if it is taken in knowing disregard of one's duties or without just

cause or excuse. In re Thirtyacre, 36 F.3d 697 (7th Cir. 1994). Under Thirtyacre, the test for

malice is that: (a) the wrongful act, (b) done intentionally, (c) causes injury to the creditor or his

property, and (d) is done without just cause or excuse.

It is argued that Joyce has satisfied all requirements to deny Wish's discharge under

§ 523(a)(6), and that Wish's deliberate and intentional attempts to injure Joyce are supported by

misrepresentations made by Wish to Joyce.  Plaintiff relies on his testimony that Wish knowingly

misrepresented the nature of the Amcore transaction and thus misrepresented the true nature of

the pledge of Joyce's money market account to Amcore.  It is said that Wish further intended that

the monies deposited by Joyce into his account at Amcore would not be used solely to purchase,

rehab and sell certain residential properties in the Chicago Metropolitan Area, but rather would

be used to reduce other First Fruits pre-existing indebtedness.

However, these asserted misrepresentations were not, for reasons earlier discussed,

justifiably relied on for purposes of Count I and the words of Defendant argued to support this

theory did not injure Plaintiff's property. Apart from relying on erroneous statements by

Defendant, Count III relies on Defendant using $100,000 of the February 2008 Note loan

proceeds for his own use and benefit and for otherwise failing to pay Joyce the profits that he was

entitled to receive for the Palatine and Devon properties.

By taking the personal loan from the February 2008 Note without Joyce's authorization,

Wish is asserted to have actually intended to harm Joyce.  Wish's taking of the personal loan

advance was indeed a wrongful act because the February 2008 Note was to be used solely to

purchase, rehab, and re-sell real estate. Moreover, it was done intentionally by Joyce; it caused

injury to Joyce's property interest when it was not repaid from Defendant's own assets; and it

was done without just cause or excuse. Thus, Defendant's conduct at the time of taking is argued

to have been malicious under <u>Thirtyacre</u>.

Plaintiff has not established willful or malicious injury to Plaintiff's property from the

withdrawal of $100,000 because that money was essentially embezzled and stolen, not damaged.

It would be a strained use of § 523(a)(6) to apply it to that taking. As noted by a Seventh Circuit

Opinion this month, that a wrongful act was done intentionally does not necessarily bring it

within the scope of § 523(a)(6). Intentional torts are not all covered by that provision. <u>Jendusa-</u>

<u>Nicolai et al. v. Larsen (In re Larsen)</u>, No. 11-cv-1256, slip op. at 3 (7th Cir. filed Apr. 18, 2012)

("Debts resulting from fraud, for example, are covered in different sections of the Bankruptcy

Code.") By analogy, debts resulting from embezzlement or larceny are covered under a separate

provision – § 523(a)(4). <u>See also</u> <u>Berkson v. Gulevsky (In re Gulevsky)</u>, 362 F.3d 961, 963–64

(7th Cir. 2004) ("Exceptions to discharge are to be construed narrowly, and the subsections of

§ 523 should not be construed to make others superfluous. Furthermore, when both a specific and

a general provision govern a situation, the specific one controls.") (citations omitted).  Plaintiff's

loss is therefore more properly remedied under § 523(a)(4) in Count II for reasons earlier given.

As to the failure to turn over profits from sales, those debts were owed to Plaintiff by

First Fruits, not by Wish.  Wish was not shown to be a guarantor of any obligations of First Fruits

to Joyce.  But, most important, the corporate form was not challenged and funds not distributed

by First Fruits cannot be treated as being held by Defendant. Moreover, such funds were not

earmarked as nor did they constitute property of Plaintiff, so their use for some other purpose

was not a harm to property of Plaintiff under § 523(a)(6).

As to the lost $400,000 that was swept by Amcore, the evidence is that Joyce willingly deposited cash in a money market account under his own name. Plaintiff signed documents whereby that account acted as collateral for the whole line of credit to First Fruits. First Fruits did in fact utilize this line of credit to purchase some real estate. The funds in Joyce's money market account were later taken by Amcore Bank, to be applied to other indebtedness of First Fruits, as permitted by documents signed by Plaintiff that he did not read. Wish was not shown to have control over the actions of Amcore Bank. Therefore, there was no wilful or malicious injury inflicted by Wish on Plaintiff's interest in that account.

## **CONCLUSION**

Pursuant to the foregoing Findings of Fact and Conclusions of Law, separate Judgments will be entered awarding judgment to Plaintiff on Count II, and separate judgments in favor of Defendant on Count I and III.

ENTER:

Jack B. Schmetterer
United States Bankruptcy Judge

Dated this _____ day of April 2012.